

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  23-cv-24173-BB

VIKRAM SINGH,                )
                             )
          Plaintiff,         )          February 28, 2024
                             )
v.                           )
                             )          Pages 1 - 43
CARNIVAL CORPORATION,        )
                             )
          Defendant.         )
_____/


DISCOVERY HEARING

BEFORE THE HONORABLE EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

Counsel on behalf of the Plaintiff:

                    EDUARDO J. HERNANDEZ, LLC
                    Suite 124,
                    8660 West Flagler Street
                    Miami, FL 33144
                    BY:  EDUARDO J. HERNANDEZ, ESQ.

APPEARANCES CONTINUED:

Counsel on behalf of the Defendant:

                      MASE MEBANE SEITZ
                      2601 South Bayshore Drive,
                      Suite 800,
                      Miami, Florida 33133
                      BY:  WILLIAM R. SEITZ, ESQ.
                      BY:  CHARLOTTE A. ROBINSON, ESQ.

Transcribed By:

                      BONNIE JOY LEWIS, R.P.R.
                      7001 SW 13 Street
                      Pembroke Pines, FL  33023
                      954-985-8875
                      caselawrptg@gmail.com

```
 1                  (Thereupon, the following proceeding was held:)

 2             THE COURTROOM DEPUTY:  Calling Case Vikram Singh

 3   versus Carnival Corporation; Case Number 23-cv-24173-Judge

 4   Bloom.

 5             Counsel, your appearances for the record, starting

 6   with the Plaintiff.

 7             MR. FERNANDEZ:  Good morning, Judge.  Eddie Fernandez

 8   for the Plaintiff.

 9             MR. SEITZ:  Good morning.  Bill Seitz and Charlotte

10   Robinson on behalf of the Defendant.

11             THE COURT:  Good morning, everybody.  Have a seat.

12             This is a discovery hearing, I believe, requested by

13   the Plaintiff, right?  No, the Defendant.  Sorry.  Mr. Seitz.

14   And I think our cutoff is the 9th of July.

15             MR. SEITZ:  That sounds correct, Your Honor.

16             MR. HERNANDEZ:  Yes, sir.

17             THE COURT:  Early discovery.  I am very impressed.

18   Usually we are having a hearing the 9th of June.

19             MR. SEITZ:  Or even after sometimes.

20             THE COURT:  Yes.  What is the issue?

21             MR. SEITZ:  All right.  So what we are here on is

22   Defendant's motion for protective order seeking protection from

23   all of the interrogatories, request for production in the

24   30(b)(6) notice served on Carnival.

25             And just to give you an touch of background on this
```

1  case and why we are seeking protection is that the Plaintiff,

2  Vikram Singh, was a former crew member of Carnival.  This isn't

3  a passenger case.  It is actually a crew member issue.

4       And as part of his employment he signed a Seafarer's

5  agreement which contains an arbitration provision in it.  Right

6  now pending before Judge Bloom is a motion to compel

7  arbitration and to enforce that agreement and to stay the case

8  until it is allowed for the arbitration to play out.

9       There is also a separate motion to stay discovery,

10  which is Docket Entry 27 in this case, which was also filed on

11  February 2, 2024, before Judge Bloom and it remains pending

12  before the Judge.

13       The reason we also noticed this hearing before Your

14  Honor is because technically it's a discovery matter.  There

15  was discovery that was served.  We included this protection

16  within the papers filed with Judge Bloom.

17       That portion was stricken because it is technically a

18  discovery issue.  So it is supposed to be before Your Honor who

19  all discovery has been referred to.  So that is what brings us

20  here today.  That is the background of this issue.

21       And what it really comes down to is both under Rule

22  26(c) and under a case that we have cited in our lengthy motion

23  to stay discovery a case that is called Chudasama -- I am not

24  going to do it justice saying it; C-H-U-D-A-S-A-M-A, 123 F.

25  3rd, 1353, from the Eleventh Circuit.

1          Is that when you have a motion filed that could be

2    dispositive of the issues.  So this isn't just a motion to

3    dismiss one count or saying they failed to plead notice with

4    specificity.  You know, motions that the complaint would be

5    correct in all that it would go.  This is potentially a

6    dispositive motion.

7          So under the prevailing case law Chudasama as well as

8    a litany of all Southern District cases, which are cited on

9    Page 3 of Docket Entry 27.  For example, *Internaves v. CV*

10   *Andromeda,* et cetera.

11          I won't go through all the citations, but they grant

12   motions to stay discovery pending a motion to compel

13   arbitration because of judicial economy and because of undue

14   expense of discovery.

15          And it is also worth mentioning some of the policy

16   reasons that are discussed.  And that is if Plaintiff were

17   allowed to file claims that they know should be arbitrated and

18   get discovery of all that, motion to compel arbitration is

19   pending, then it would be a way for them to either pressure

20   Defendants or get discovery that they are not otherwise

21   entitled to.

22          For example, in this case, the Seafarer's agreement

23   arbitration provision has specific limitations on what is

24   allowed for permissible discovery in these arbitrations.  It,

25   in effect, is a voluntary exchange of information in a

 1   three-hour deposition that each side gets and that's it.

 2          And you know the policy for arbitration is expense,

 3   judicial economy, et cetera.  So allowing the Defendant or the

 4   Plaintiff at this time to obtain discovery from Carnival would

 5   not be in the interest of judicial economy, the policies behind

 6   arbitration and limiting expense, and also it would cause

 7   Carnival undue burden and expense under Rule 26(c).

 8          So for these reasons, Your Honor, we would ask you to

 9   enter the protective order from discovery until such time as

10   Judge Bloom has the opportunity to rule upon the motion to

11   compel arbitration and, likewise, the motion to stay discovery,

12   which is pending before Her Honor.

13          I suppose I would say this is probably, to be so bold,

14   a Judge Bloom issue to some extent given the motions pending

15   before Her Honor, but we wanted to seek protections.  So later

16   on if our motions are denied, it is not that waived -- our

17   objections are waived responses.  We wanted to bring it before

18   Your Honor in an abundance of caution.

19          THE COURT:  Now what rules of arbitration does the

20   agreement contemplate?

21          MR. SEITZ:  It is under NAM, Your Honor.  It is the

22   NAM procedures.  It is a body; N-A-M, a body governing

23   arbitration much like the American Arbitration Association.

24   It's a competitor.

25          THE COURT:  Oh, I see.  It is specifically nautical

```
 1   cases or is it --
 2          MR. SEITZ:  My experience with NAM is in, yes, these
 3   Sea Fairer type cases and predominantly it is Carnival that
 4   uses it services for their crew members.
 5          THE COURT:  I see.  And then, now what rules of
 6   discovery does it allow?
 7          Because in past cases I have seen where this used to
 8   be a bigger issue, but now most arbitrations have some basic
 9   exchange of discovery anyway.  So I have never --
10          MR. SEITZ:  These are --
11          THE COURT:  I have never seen such a big difference.
12          MR. SEITZ:  I actually have the benefit because, as
13   you know, Judge, our firm handles cases with all the major
14   cruise lines.  And Royal Caribbean and Norweigian arbitrate
15   with the American Arbitration Association or the Triple A.
16          THE COURT:  Okay.
17          MR. SEITZ:  And they have more, I would call, typical
18   -- although not the same as federal court discovery, but
19   generally sort of like it with limitation.
20          Whereas, under NAM what is allowed is -- the way it is
21   an interesting process, Judge.  Mr. Hernandez' client files an
22   arbitration.  It is like a page.  It says these are my claims.
23          Then comes a time where the claimant files all of
24   their evidence at one time.  They get to take one deposition of
25   our client limited to three hours under the contractual
```

1  provision and rules and then they submit their claim.  All

2  their evidence is in.

3      I then have an opportunity to submit all of my

4  evidence.  Including sworn statements.  Whatever that may be.

5  That goes in.  And then, when you get to the final hearing, it

6  is actually just cross-examination.

7      All of the direct evidence is in and it is

8  cross-examination to find, you know, bias and those things and

9  the reason we have cross and then an award is issued.  It is

10  actually a very streamlined efficient process.  So it is very,

11  very limited discovery.

12      THE COURT:  And so, then, the Plaintiff is never

13  allowed to get documents from the Defendant.

14      MR. SEITZ:  There are no requests for production.

15  That is correct.

16      THE COURT:  Okay.  Mr. Hernandez.

17      MR. HERNANDEZ:  Thank you, Judge.

18      The underlying issue here, Judge, is this is a single

19  count complaint solely for intentional infliction of emotional

20  distress.

21      The Eleventh Circuit, in no uncertain terms, have said

22  that intentional torts in a seaman's context are not subject to

23  arbitration.  Most recently in *Maglana v. Celebrity,* Case

24  Number 20-14206, 2023 and *Doe v. Princess*, 637 F.3d, 1204.

25      I mention that and I know it is outside the issues of

1  discovery today, but it is very important here.  We are

2  traveling under a single count complaint for intentional

3  infliction of emotional distress.

4        The Eleventh Circuit has said, I repeat, that these

5  intentional tort claims in seaman's case notwithstanding

6  agreements to arbitrate, such as exist here, are not

7  arbitrable.

8        Okay.  So it would be a colorable argument, but what

9  the Defense says today if it is underlying motion to compel

10  arbitration had merit and I submit it doesn't.

11        THE COURT:  What was that case cite that you told me

12  about?  The Eleventh Circuit cite?

13        MR. HERNANDEZ:  Well, there are two.  I submitted them

14  to Your Honor on Friday but --

15        THE COURT:  Oh, I did get that.  I did get that, yes.

16        MR. HERNANDEZ:  *Doe v. Princess*, 657, F.3d, 1204,

17  Eleventh Circuit, 2011.  And most recently *Maglana v. Celebrity*

18  *Cruises,* Case Number 20-14206, Eleventh Circuit, 2023.

19        Both of these decisions -- and there is also decisions

20  out of the Southern District; Judge Moreno in *Rutledge v. NCL*,

21  these decisions in no uncertain terms state that intentional

22  tort complaints, despite the crew member having signed an

23  arbitration agreement, intentional tort claims are not subject

24  to arbitration.

25        And if you review our complaint, Docket Entry 1, you

1  will see that we have a single count and it is solely for

2  intentional infliction of emotional distress.

3        And the reason I --

4        THE COURT:  And what is the nature of the complaint?

5  How did they come with the tort against them?

6        MR. HERNANDEZ:  So what happened here, this man, a

7  very long time employee, chief security officer, in fact, was

8  falsely accused.  There was a setup on the ship, for lack of a

9  better word.  He was falsely accused of touching an employee,

10 but the intentional infliction doesn't come there.

11       What happened was, he was lured to Miami under false

12 pretenses.  It is all attached to our complaint.  They lured

13 him to his supervisors as a -- the Security Department, the

14 shore-side security folks here at Carnival, sent him an e-mail

15 stating because of your experience on Australian ships, we need

16 you in Miami basically tomorrow to conduct training for us.

17 Miami isn't Australia so tomorrow was actually today.

18       So he advised his supervisors, listen, I am willing to

19 do whatever you need, but you need to know there is nobody who

20 can relieve me.  We are understaffed, so on and so forth, and I

21 am undergoing medical treatment.

22       The response was, no, no, you need to get to Miami

23 even if the ship needs to be left -- and I am paraphrasing --

24 even if the ship from a security standpoint needs to be left

25 under man's and so forth, we need you here.

1        And he followed orders and he came here and once he

2   arrived here, something very bizarre happened.  He received a

3   very threatening message of either What's App or Snap Chat, or

4   one of these teenager things like you better not talk.  We know

5   where you live.  Things like that.  So something was afloat.

6        And when he shows up at Carnival's offices the next

7   day, he's basically put in a room and not let out, I believe,

8   and confronted by I think the Department Head of the Security

9   Division, Arturo Loynez.  And another two individuals who

10   basically said -- well, they didn't say it, but he quickly

11   found out there was no training they wanted him to conduct.

12        He was lured here because of this accusation and the

13   intention was to fire him, which they ended up doing despite

14   the fact that he was on medical leave.  They made him go back

15   immediately to India and they just cut him off from the medical

16   treatment standpoint and effectively forced him to retire.

17        And it is all spelled out in the complaint.  I could

18   go into some of the more egregious facts, but all of these

19   facts, what they support is intentional torts.  And the cases

20   that we provided to Your Honor on Friday -- and there is more

21   -- say that these intentional torts are not subject to

22   arbitration.

23        So I submit that there is this pending motion to stay

24   -- well, there is a pending motion to compel arbitration and

25   then thereafter a motion to stay.  And I submit that there is

1  contrary to all controlling authority from the Eleventh
2  Circuit.  Primarily *Doe* and more recently *Maglana*.
3          And the reason for this, Judge, the policy reason for
4  this is the case law is in unison.  And they say that the
5  reason intentional torts are not subject to arbitration is that
6  these types of torts are not contemplated as part of the
7  employment agreement, which makes sense.
8          You know, you don't expect an employer to
9  intentionally harm you.  And that is why they are outside the
10  realm of this arbitration that we have all come to know in the
11  last, I don't know, 10, 15 years in the crew member context:
12  You know, all these cases used to all be in the state court and
13  then federal court and then no more.
14          But, again, these intentional tort claims are outside
15  all of this and there is binding Eleventh Circuit precedent.
16  So that is from an underlying legal basis and, you know, from a
17  discovery standpoint and I think you have probably authored
18  some of these decisions.
19          First and foremost the rules, the Federal Rules, do
20  not provide for stay of proceedings and stays are disfavored.
21  Why?  Because they, you know, they tend to interfere with the
22  Court's control of things.
23          And here, you know, we are on a rather short deadline
24  and we have expert disclosures on June 11th and the discovery
25  cutoff is July 9th and trial November 4th.  And this is

1   repeated in the Southern District of Florida discovery

2   handbook.

3          And finally, really as concerns this case,

4   pragmatically speaking, the Defense has made zero showing of

5   prejudice.  Zero showing of undue burden other than, you know,

6   generalities.  They made no quantification for burden, which I

7   submit the burden is on them to do so.

8          So from a legal standpoint the underlying motions, I

9   submit, are not well taken and from a discovery standpoint

10  stays are disfavored and discovery should be allowed.

11         MR. SEITZ:  May I make one point, particularly, Your

12  Honor?

13         THE COURT:  Yes.

14         MR. SEITZ:  So Mr. Hernandez referred to the *Maglana*

15  that case and the *Doe v. Princess* case when talking about the

16  underlying bases of the motion to stay and compel arbitration.

17         It is a little more complex than what was just laid

18  out.  They have been briefed in full.  Including Docket Entry

19  24, which was the reply and also the initial motion to stay,

20  which was Docket Entry 19.

21         But what I am going to refer to is on Docket Entry 24,

22  Roman numeral II where Carnival replies to this same argument

23  now being posited and those cases are distinguishable in this

24  respect.

25         In those cases the movant asked the Court to compel

1   arbitration and determine which claims were arbitrable and the

2   District Court did so.

3          Here it is important to note that the contracted

4   agreement between Carnival and Mr. Singh, who is Indian, calls

5   for the application of Filipino law.

6          We are not asking this Court and the Honorable Judge

7   Bloom to make a determination about which claims are, in fact,

8   arbitrable.  That should be decided by the appointed arbitrator

9   who has already been appointed under Filipino law.  The

10  contract should be interpreted as such.

11         And Your Honor, in no way am I saying that this Court

12  is not capable of interpreting Filipino law.  It is.  I

13  understand that.  This is what the agreement calls for and this

14  is the contractual procedure.

15         Carnival is arguing only that the responsibility of

16  determining enforceability of the arbitration agreement belongs

17  to an arbitrator, which is noted in the motion and is a

18  permissible delegation under binding law and then Carnival goes

19  on to cite *Rent-a-Center West,* 561 U.S. 63.

20         And then quoted in *Martinez v. Carnival Corp,* 744

21  F.3d, 1240, Eleventh Circuit, 2014 and that goes on to say:

22         "A Court may include that the parties agree to

23  arbitrate the very issue of arbitrability when there is a clear

24  and unmistakable evidence that they did so.  And that is

25  reflected in the Seafarer's agreement, which I believe is

1   attached as an exhibit to Mr. Hernandez' complaint.

2          So, Your Honor, in summation what I would say, I think

3   that given there are strict contractual limitations on the

4   exchanged information and procedure here, that Filipino law

5   applies.

6          That there is a simultaneously proceeding arbitration

7   with an arbitrator appointed in the Philippines that we should

8   at least allow Judge Bloom to rule on the subjective motions,

9   on the motion to compel and stay, before any expense is done

10  here with respect to the extensive discovery certifying Mr.

11  Hernandez, which goes well beyond what is allowed under the

12  contractual agreements.

13         THE COURT:  So your argument to get around *Maglana*  is

14  that Filipino law is different?  Is that the argument?

15         MR. SEITZ:  It is that Filipino law applies and here

16  we haven't gone as far as the claimant and *Maglana* did.

17         We are not asking this Court, the Southern District of

18  Florida, to make a determination about whether or not this

19  particular claim is arbitrable.  That decision should be made

20  by a Filipino arbitrator pursuant to the terms of the contract.

21         This haste should be solely with the Filipino

22  arbitrator to determine which of the claims fall within the

23  terms applied to Filipino law.

24         MR. HERNANDEZ:  Judge, I have to respond because

25  Filipino law, it doesn't apply here.  The arbitrator happens to

1   be Filipino.

2          MR. SEITZ:  Forgive me.  Bahamian law.

3          MR. HERNANDEZ:  I think the law that applies here is

4   the law of the flag.  Typically flag is Panama.

5          What happens is in these arbitrations, the situs of

6   the arbitration is in three locations, typically; England,

7   Philippines, Filipino seamen and/or the closest place.  You

8   know what?  That was inartful.  It is typically three

9   locations; Panama, the Philippines for Filipino crew members

10  and for those crew members where the Philippines is the closest

11  situs and actually it may just be those two and possibly --

12         MR. SEITZ:  It's France

13         MR. HERNANDEZ:  What is the place in France?

14         MR. SEITZ:  It's in Monaco or --

15         MR. HERNANDEZ:  Monaco.

16         MR. SEITZ:  It is Bahamian law, Judge.  That is a

17  mistake on my part.  I was thinking about the situs.

18         MR. HERNANDEZ:  But the important part here, Judge, is

19  contrary to what I just heard.  If you look at the motion that

20  Carnival has filed here and they have not filed a motion to

21  dismiss.

22         They have filed a motion to compel arbitration and

23  requested that, quote, the Court compel arbitration in accord

24  with the parties' agreement.  And further, in their motion they

25  have admitted that the Court has jurisdiction to compel

1   arbitration.

2          So they have asked for exactly what Celebrity asked in

3   *Maglana*.  They put this in the Court's lap, so to speak.  They

4   have asked the Court to rule on the issue of arbitrability.

5          Okay.  So law aside, Panamanian, Bahamian, Filipino,

6   law aside, the District Court because of Carnival's doing has

7   been tasked with ruling on whether this claim is arbitrary.  I

8   go back then to the federal precedent here that says these

9   claims because intentional are not arbitrable.

10         MR. SEITZ:  Judge, if you are looking for Malana,

11  submitted by Mr. Hernandez, the discussion of our points are

12  raised on Pages 7 through 10 where it talks about the strategy

13  that those particular defense asking the Court to determine not

14  only arbitrability, but what claims fell under it.

15         Here, we have not taken that tactic.  We are asking

16  the Court only to send this off to the foreign jurisdiction to

17  determine the arbitrability.

18         THE COURT:  Now I am just reading through the *Maglana*

19  case and the *Doe* case on which it relies.  Isn't the *Doe* case

20  upon which it relies based upon the language of the agreement

21  and that is why it is not arbitrable?

22         Because it does not seem to cite any like policy,

23  principle, why intentional tort claims in theory are not

24  arbitrable.  It is relying on *Doe* and then *Doe* seems to be

25  relying on the language of that agreement.

1      Is there some kind of broader policy that the Eleventh

2  Circuit, you think, is applying?

3      MR. HERNANDEZ:  I believe there is, Judge.

4      Okay.  So interestingly enough, if you look at the

5  agreement in *Doe* and compare it to the agreement here, they are

6  almost identical.  They both even go as far as to say that

7  claims, intentional tort claims, are arbitrable under the

8  agreements.

9      But the Eleventh Circuit said, no, they are not

10  because policy reason, *Jones v. Halliburton* because these types

11  of intentional torts are not the types of things that are

12  contemplated by an employment agreement, by an employment

13  agreement, by an employer/employee relationship.

14      So the policy reason, I submit, is elaborated in *Jones*

15  *v. Halliburton*, which I just said intentional torts.  The issue

16  is foreseeability, Your Honor are intentional torts foreseeable

17  in a employment context and the logical answer is no.

18      *Jones v. Halliburton,* 583 F.3d, 228, Fifth Circuit,

19  2009.  So that is the policy reason, I believe, to my reading

20  of *Doe* and *Maglana*.

21      So from a policy standpoint these things are not

22  contemplated.  So they are outside the realm of the things that

23  are arbitrable, number one.  And yeah, I mean, I agree *Maglana*

24  relies heavily on *Doe* and something importance in the *Maglana*

25  decision at Page 14 is quote:

1          "By contrast an intentional tort claims like false

2   imprisonment and central infliction of emotional distress are

3   available to all kinds of Plaintiffs."

4          Meaning, a passenger, a crew member, you know, the

5   cruise line context.  Any Plaintiff.  Okay.  It is not a claim.

6   It is not a cause of action that is unique to seamen.  That is

7   why it is outside the realm of arbitration and that they

8   include this quote:

9          "Thus, the District Court erred in applying Artero

10  seaman's status.  Artero was the seaman case that the Defense

11  had relied upon in *Maglana*.  Seaman status says the intentional

12  tort claim here.

13         I mean, I submit that our case is on all fours

14  squarely within Malana and it is --

15         MR. SEITZ:  So, Your Honor, turning to *Maglana*, and I

16  am looking at what has been filed by Mr. Hernandez.  It was

17  submitted to the Court.  I am looking at Page 9 and this is the

18  Eleventh Circuit discussing the issues and it says:

19         "The parties can agree to arbitrate the gateway issue

20  of arbitrability by including a provision in the agreement

21  delegating this decision to the arbitrator."

22         That is what was done here.  So far we are right

23  within what the Eleventh Circuit said in *Maglana* and then it

24  goes to discuss the issue.  First, did the District Court err

25  in deciding the question of arbitrability and when it discusses

1   that it says turning to the first issue:

2        "Whether the Court or arbitrator should decide the

3   arbitrability of Plaintiff's tort claims we note that this

4   issue arises in this appeal because Celebrity's response to

5   *Maglana* and *Bugian's* argument that the arbitration clauses in

6   their employment agreements do not cover their tort claims is

7   that the arbitrability question should have been decided by the

8   arbitrator and not the Court."

9        That is what is important there and those cases they

10  ask for this Honorable Court to make a determination as to

11  whether or not that tort claim fell within the agreement.  We

12  are not doing that here.  We are doing the opposite.  We are

13  following the Eleventh Circuit.  I go on:

14       "It is true that *Maglana* and *Bugian* signed employment

15  agreements with the delegation provision giving the arbitrator

16  exclusive authority to resolve the issue of arbitrability."

17       And here is the discussion:

18       "But the problem for Celebrity in the *Maglana* case is

19  that it took precisely the opposite position in the District

20  Court below.  Below it chose not to rely on its delegation

21  provision to argue to the District Court that only the

22  arbitrator could decide arbitrability."

23       We here are taking the exact opposite tract that

24  Celebrity didn't.  We are saying the opposite.  We are not

25  asking this Court to interpret the terms of the agreement.  We

1  are asking this Court to send it all to the arbitrator to make

2  the decision about what falls within.

3          Finally, skipping a line and I will read it all for

4  completeness:

5          "To the contrary it petitioned the District Court to

6  resolve the arbitrability issue by a (inaudible) order

7  directing Plaintiffs to proceed in arbitration.  Celebrity,

8  thus, invited any claimed err because instead of arguing to the

9  District Court that only the arbitrator can decide

10 arbitrability, it did the very opposite.  It asked the District

11 Court to decide for itself whether the dispute was subject to

12 arbitration."

13         We are doing the exact opposite of what Celebrity did

14 in *Maglana*.  We are following Eleventh Circuit's guidance.  We

15 believe our motion to stay and our motion to compel arbitration

16 is well taken for that reason.  And discussed in extensive

17 briefing before Judge Bloom, we would ask Your Honor to just

18 pause, if you will, and protect discovery until Judge Bloom

19 rules.

20         What we would ask that if Judge Bloom does deny our

21 motion, then let's say 14 days to respond to Mr. Hernandez'

22 pending discovery without waiver of objections, et cetera, and

23 to coordinate with him the corporate representative deposition.

24         But this issue is before Judge Bloom and Her Honor

25 should have the opportunity to consider this, not on the

1  hearing on the fly, but with all the papers before her and make

2  the decision because there is a discussion of multiple Eleventh

3  Circuit cases and this is a somewhat unique issue.  So we would

4  ask that that be done first.

5          MR. HERNANDEZ:  Judge, that is just simply inaccurate.

6          If Your Honor looks -- I don't have the docket number,

7  but if Your Honor looks at the Defense's January 2nd motion to

8  compel arbitration --

9          THE COURT:  Yes.

10          MR. HERNANDEZ:  -- they outright say and ask the Court

11  to compel arbitration in accord with the parties' agreement.

12  They admit and concede that the Court has jurisdiction to

13  compel arbitration.

14          And in the wherefore clause they ask exactly what the

15  Defendant in *Maglana* asked for, which is an order that

16  Plaintiff be directed and compelled to arbitrate.

17          THE COURT:  Mr. Hernandez, do you concede that your

18  claim arises out of or is in connection with the agreement?

19          MR. HERNANDEZ:  Judge, that's just it.

20          What they did to this man and what would constitute

21  the facts that support our single count complaint, this does

22  not arise out of the agreement.  This does not arise out of his

23  employment.  This does not arise out of an employer/employee

24  relationship.  This was an intentional act.

25          THE COURT:  Doesn't the intentional act merely filing

1  under false pretenses?  That's what I heard you say.  Is that

2  the intentional act?

3          MR. HERNANDEZ:  Well, there is more to it than that.

4          THE COURT:  Okay.

5          MR. HERNANDEZ:  There is keeping him from medical

6  treatment.  There is detaining him, basically at their offices

7  that they would not allow him to leave.  All the conduct that

8  we went into there.

9          For example, they had him write a statement.  They

10 didn't like what he said and they tore it up and made him write

11 another statement compelling him to do these things.

12         None of this, I submit, falls under the agreement was

13 part of the employment, employer/employee relationship.

14         THE COURT:  And when was --

15         MR. HERNANDEZ:  It is about the foreseeability.

16         THE COURT:  Right.  Foreseeability that it would arise

17 under performance of the agreement.

18         What was in it for them as far as you are concerned?

19 I guess I should pull up the complaint.  What was it in for

20 them and why did they do this?

21         MR. HERNANDEZ:  Judge, you know, I don't know why

22 Carnival does anything.  You have to understand, this is a

23 gentleman, a chief security officer, who was with them for a

24 number of years.  And you know, I hate to put it this way, but

25 since you are asking me, he knows where a lot of skeletons are

 1  for this company because of the new position that he was in on

 2  their ships.

 3          I am not saying that is why they did it.  I really

 4  don't know.  I think it was rather punitive.  You know, there

 5  had been an issue in the past with one of the captains, a

 6  personal issue between this man and one of the captains, so to

 7  speak.

 8          I don't know if there was pressure brought to bear.  I

 9  really don't know.  This is something that came out of nowhere.

10  Like I said, it was punitive.  It was intentional.

11          I have seen cases where other crew members are accused

12  of much more and get a slap on the wrist and are not terminated

13  and/or forced to retire like this man was.

14          Part and parcel why we need some discovery here,

15  Judge, because I think there may be something more sinister

16  afoot here than the record bears out to date, but I can't fully

17  answer that question as to what was in it for Carnival.

18          THE COURT:  To you want to respond to this point?

19          MR. SEITZ:  Yes, Your Honor.

20          So obviously Carnival's position is that it vehemently

21  agrees.  I don't want to get -- unless Your Honor needs more

22  factual allegations than what you heard because this

23  arbitration agreement contains a confidentiality provision.

24  And that's why it is one of the benefits of arbitration is that

25  facts and things like this remain somewhat confidential.

1          I will say that Carnival vehemently disagrees with

2    Mr. Hernandez' interpretation of it.  This is a person who was

3    accused, or I will say committed sexual misconduct on the ship

4    directed towards another, at least one crew member.

5          I don't think there is a need at this point to get

6    further into what was alleged to have occurred, but I would

7    posit to this Court that any investigation done with respect to

8    this man's actions was well taken.

9          THE COURT:  And well, my brief review of this is the

10   *Doe* case appears to be interpreting relating to or arising out

11   of the agreement as a limitation.  And so, therefore, unlike a

12   clause that left that took that provision out, any disputes

13   whatsoever between the parties shall be submitted to

14   arbitration, right?

15         It distinguished that to any dispute between the

16   parties arising out of or in connection with the agreement, it

17   viewed that as a limitation.  And so, then, it viewed that

18   limitation to exclude a false imprisonment and intentional

19   infliction claim in *Doe*.

20         So I guess assuming then the arising out of language

21   is the same, the word relating is not in there, but arising out

22   of is.  Why would this type of claim not fall outside the scope

23   of that limitation?

24         MR. SEITZ:  I understand exactly what you are saying

25   and --

1           THE COURT:  Because ordinarily somebody they don't

2    hire somebody to -- basically, what you are saying is that he

3    committed a crime, in effect, on board the vessel or at least a

4    tort upon another employee.

5           And so, therefore, that conduct warranted his

6    expulsion, for lack of a better term.  Is that contemplated by

7    the agreement?

8           MR. SEITZ:  I would say what occurred on board is, but

9    Your Honor I have to say these two things.

10           Mr. Singh was not terminated.  He retired and he was

11   paid his retirement benefits.  So this person -- and then was

12   patriated, I think, back to Australia and ultimately back to

13   India where he was from.  So he wasn't abandoned.

14           Many of the things that Mr. Hernandez said, we

15   obviously have a different interpretation.  Your Honor, I have

16   been before you many times and I do this, respectfully.  This

17   issue of what falls within the terms and interpretation, I am a

18   little weary to answer that to some extent because that is the

19   pitfall for which Celebrity fell into before.

20           We are not asking this Honorable Court to make that

21   determination.  That should be done by the arbitrator.  It

22   would be our position that these are arbitrable claims, but I'm

23   not asking just for clarity for this Court to make that

24   determination.  That should be made by the arbitrator.

25           THE COURT:  Right.  And what about that issue on the

1    delegation?  Part of distinguishing the -- what is that case

2    called?  The *Maglana* case, is that in that case the Court found

3    that the employer had, in fact, requested that the Court

4    determine the arbitrability.  And so having requested the Court

5    to determine arbitrability it can't then go back on it now just

6    because it is lost.

7              So how do you deal with that here?

8              MR. HERNANDEZ:  Judge, it is what I said before.

9              If you look at the Defense' motion filed on

10   January 2nd --

11             THE COURT:  Okay.

12             MR. HERNANDEZ:  The motion to compel arbitration, they

13   asked that the Court compel arbitration.  They concede that the

14   Court has jurisdiction to compel arbitration; i.e., the issue

15   of arbitrability.  And ultimately, in the wherefore clause, do

16   exactly what Celebrity did in *Maglana*, which is ask for an

17   order compelling arbitration.

18             MR. SEITZ:  Judge, just for --

19             MR. HERNANDEZ:  It is on all squares what occurred in

20   *Maglana*.

21             MR. SEITZ:  Judge, that's a bit disingenuous.

22             THE COURT:  It is on Page 4 they say of the motion:

23             "Arbitrability should be decided by an arbitrator and

24   not the Court.  The parties continue to arbitrate gateway

25   questions such as whether the parties have agreed to arbitrate

1  or whether their agreement covers a controversy."

2          "If there is an agreement to arbitrate the issue of

3  arbitrability, then the FAA operates on this additional

4  agreement as it does any other.  Thus, the proper remedy is

5  sustained in federal litigation and compel arbitration.

6          MR. HERNANDEZ:  And compel arbitration.  That is the

7  operative prayer for relief, Judge.  They have asked the

8  District Court to compel arbitration.  It is exactly what the

9  Defense says Celebrity did in *Maglana*.

10          MR. SEITZ:  Judge, literally on the first page of

11  Docket Entry 19 it says, Plaintiff agreed to arbitrate the

12  issue of arbitrability.  The entire then motion goes to totally

13  that.

14          More importantly on Docket Entry 24, it says and I

15  quote -- it goes on to talk about why Mr. Hernandez' arguments

16  here are incorrect and then it says:

17          "Carnival is arguing only..."  Bolded and emphasized

18  and I always regret doing that in a pleading, but here it was

19  done to emphasize a point.

20          "Carnival is arguing only that the responsibility of

21  determining enforceability of the arbitration agreement belongs

22  to an arbitrator which, as noted in Carnival's motion is a

23  permissible delegation under binding law."

24          And that's on Page 4 of Docket Entry 24.  Carnival

25  clearly showed the intent to not do what was done in *Maglana*

1    and not done in *Doe* and to have these issues determined by the

2    arbitrator.  And that is really for Judge Bloom to determine

3    whether we are accurate or not and, then, proceed from there.

4              MR. HERNANDEZ:  Judge, if that were the case, Carnival

5    would have filed a motion to dismiss and not a motion to compel

6    arbitration.  They chose not to as Celebrity did in *Maglana*.

7              THE COURT:  Now tell me what discovery you were

8    pursuing that you have been blocked on.

9              MR. HERNANDEZ:  I am glad you asked and I should have

10   mentioned it, Judge.  It is really, you know, in comparison to

11   other cases I think it is rather tame.

12             There are 15 interrogatories and they are not sort of

13   broad.  They are directed at the intentional tort because that

14   is the only thing we sued on.  There are 46 requests for

15   production and there is a deposition notice that has twelve

16   areas of inquiry.

17             Basically about why no investigation into the

18   allegations on the ship were done.  What occurred at Carnival's

19   office that fair day.  Why there has been no medical treatment

20   given to the man.  Although he was receiving it at the time.

21   Why he was forced to retire and things of that nature.

22             It's the actual -- I don't have paper copies with me,

23   but it was submitted to Your Honor by Mr. Seitz' office the day

24   before yesterday.

25             Like I said, I submit it is not burdensome discovery.

1   It is 15 interrogatories, 46 requests, and the deposition

2   notice is twelve areas of inquiry.

3         THE COURT:  Okay.

4         MR. HERNANDEZ:  And I knew this because we have

5   mediation in to late April; Court ordered, District Court

6   ordered (inaudible).

7         THE COURT:  The problem is it is going to be hard to

8   determine that -- I mean, the *Maglana* case also was *Doe*

9   involved the aftermath of a sexual assault and that is what you

10  are alleging occurred here.

11        MR. SEITZ:  There have been allegations.

12        THE COURT:  I thought that you said that he was fired

13  because --

14        MR. SEITZ:  He was never fired.  He retired.

15        THE COURT:  But he was --

16        MR. SEITZ:  What he did was not brought back for

17  another contract.

18        MR. HERNANDEZ:  There's an e-mail attached to our

19  complaint where Arturo Loynez says we have determined that it

20  is better for you to retire.

21        THE COURT:  So he was forcibly retired, basically?

22        MR. HERNANDEZ:  Exactly.

23        THE COURT:  So it was in connection with a sexual

24  assault.  It wasn't because he wasn't a good security officer,

25  right?  You are not alleging that.

1     MR. SEITZ:  I would probably say that making

2  inappropriate advances to a fellow crew member of a sexual

3  nature could be a problem for a chief security officer on a

4  Carnival vessel.

5     THE COURT:  In other words --

6     MR. SEITZ:  And it was only a --

7     THE COURT:  And that would be true of any employee,

8  right?

9     MR. SEITZ:  Yes.  Judge, yes.

10    I think it is important to remember a comment I made

11  early on is that, Judge, here we have a contracted for scope of

12  arbitration and the procedures which go on in it.  Including

13  limited discovery, which we talk about in our motion to stay

14  discovery is more adverse than the motion to stay discovery.

15    THE COURT:  How could a good faith arbitrator ignore

16  that holding in this case?

17    MR. SEITZ:  That holding doesn't apply, Your Honor.

18    THE COURT:  Why not?

19    MR. SEITZ:  Bahamian law applies to this

20  interpretation.  Respectfully, the Eleventh Circuit has no

21  binding authority on the arbitrator.  It is an arbitrator

22  sitting in the Philippines applying Bahamian law.

23    THE COURT:  And I guess what you are saying is under

24  Bahamian law they don't treat it the same way is what you are

25  saying?

```
 1              MR. SEITZ:  That would be my position.

 2              THE COURT:  And have you cited any authority to Judge

 3  Bloom about that issue?

 4              MR. SEITZ:  We have not.

 5              THE COURT:  Okay.

 6              MR. HERNANDEZ:  Judge, may I make a comment?

 7              THE COURT:  Yes.

 8              MR. HERNANDEZ:  This claim that we bring before this

 9  Court is brought here because in an arbitration we cannot bring

10  it.  Whether Panamanian or Bahamian law, I forget which one we

11  are traveling under here.

12              On the arbitration side there is no cause of action

13  akin to what we have here for intentional infliction of

14  emotional distress.  It is a *non sequitur* insofar as what

15  discovery is going to be had, if any, in the arbitration which

16  is on the traditional seaman's remedy side of things.  There is

17  no claim, intentional claim in the arbitration.

18              THE COURT:  Explain that.  What does that mean?

19              MR. HERNANDEZ:  It means that this man has no claim in

20  the arbitrable forum where intentional infliction of emotional

21  distress -- the only forum where he can get that redress is

22  here in the district court.

23              THE COURT:  I don't understand.

24              If the arbitrator determines that under Bahamian law

25  this type of allegation is subject to Bahamian law arbitration.
```

1    Can't he then determine the claim?

2         MR. SEITZ:  Yes.

3         MR. HERNANDEZ:  No, because see, that's why the cruise

4    lines are so hot and why they fight so hard on this

5    arbitration.  The scheme of remedies for seaman in arbitration

6    is very limited.

7         For example, in the Bahamas there is no Jones Act

8    negligence as we know it in the United States.  There is no

9    unseaworthiness as we know it in the United States.

10        And the important one, not that it matters here, but

11   just by way of edification, the important one that I presume

12   you saw it in the old days where under the Jones Act and under

13   maintenance and cure, employers such as Carnival owe crew

14   members a duty of providing prompt and adequate medical

15   treatment.

16        The consequence of that is if the crew member has

17   treatment shore-side, which is negligent, malpractice is

18   committed, the cruise line is liable for that because it is an

19   ongoing duty.

20        Well, what has happened over the last ten, 15 years in

21   these arbitrations is -- and we know this now and both sides

22   know this now, there is no vicarious liability claims.  For

23   example, Panamanian law, Bahamian law, Maltese law, the three

24   or four legal bodies that apply to these arbitrations.

25        So when we, as the Plaintiff's lawyers when we file

1  these suits in -- I shouldn't call them suits, but when we file

2  an arbitration, if it is a shore-side medical negligence claim,

3  we are out of luck.

4       So the scheme of recovery in arbitration is very

5  limited.  It is limited and I forget and I apologize if this is

6  Panama or Bahamian law.  The two are very similar.  Panama is a

7  little more generous because it is based on U.S. law, but

8  Bahamian law is very restrictive.  It is somewhere Maltese

9  seaman's law.

10       And basically, there is a duty to provide wages.

11  There is a duty to provide medical treatment, but there is

12  really no duty to provide medical treatment once the crew

13  member is ashore.

14       And then, they all sort of revert back to the MLC, the

15  Maritime Labor Convention, which if memory serves, went into

16  effect in the International Convention that went into effect in

17  2011.  It is a little more detailed and it really does not

18  provide the remedies that Jones Act and general Maritime law

19  provide to these seamen.

20       Again, the important part here is our claim before

21  this Court is solely for intentional infliction of emotional

22  distress.  It is not a claim that we brought in arbitration and

23  we haven't brought it because it is not available to us, the

24  arbitration.

25       THE COURT:  But in order for it not to be available

1  there's going to have to be no Bahamian (inaudible) to an

2  intentional tort claim like that.  Do I know that that's the

3  case?  Do we know that?

4       MR. HERNANDEZ:  There may be shore-side, but not for

5  seamen's recovery, which is the limitation of Bahamian law or

6  Panamanian law that we travel under.  I think it is Bahamian

7  law.

8       MR. SEITZ:  It's Bahamian.

9       MR. HERNANDEZ:  There is no provision for that.

10       THE COURT:  Do you agree with that?

11       MR. SEITZ:  I would be loathed to say off-the-cuff

12  that there is not something similar, but I would say this.  The

13  Supreme Court, the Eleventh Circuit, they have held that

14  foreign seaman can contract for arbitration under foreign law.

15  It is enforceable.

16       Whether or not Mr. Hernandez, I would posit to you

17  that it is irrelevant whether or not Mr. Hernandez' client has

18  this type of claim available under Bahamian law.  That is for

19  the arbitrator to determine.

20       And if he doesn't, then that is -- I hate to say it,

21  but that is the fact of the matter and that is why they

22  contract for these types of provisions and it is not for that

23  agreement to be upset.

24       Otherwise, what claimants would do, they would come in

25  and they would allege any kind of claim they could come up with

1   to get out of an arbitration agreement saying I didn't have

2   these six claims.

3          But I am looking at our motion to compel DE 19 in the

4   Court determining Batista and Royal Caribbean that these

5   provisions are enforceable and it should be done so here.

6          Batista is -- I am looking at 396 F.3d at 1294.  And

7   then it goes on to cite *Lindo v. Norweigian,* 652 F.3d, 1257 and

8   a number of other cases.

9          And in fact, it says that the prerequisites are met,

10  which they are here, the Court must compel arbitration, unless

11  one of the New York Conventions affirmative defenses apply and

12  none so apply.

13         This gentleman, there was an agreement in writing to

14  arbitrate.  The agreement provides for arbitration in the

15  territory of signatory of the New York Convention is both

16  Panama and Philippines are signatories.  Here it is in the

17  Philippines.

18         Third the Seafarer's Agreement relates to commercial

19  relationship, i.e., employment.

20         And fourth, the Plaintiff is an Indian and not an

21  American citizen.

22         Accordingly, all four prerequisites exist and the

23  Court has jurisdiction to compel arbitration under the New York

24  Convention.  Again, these are all issues.

25         And Judge, what I was going to point out is when we

1   talk about arbitration, you know, the United States Supreme

2   Court discusses the very purpose and it goes on to say, you

3   know:

4          "Allowing a Plaintiff to do an end-around on the rules

5   and to get more discovery would render compelling to

6   arbitration futile.  This would defeat the Court's complicity,

7   formality, and expedition of arbitration and contravene the

8   public policy favoring arbitration due to its efficiency."

9          It is *Gilmer v. Interstate/Johnson Lane Corp,* 500 U.S.

10  20.  Citing *Mitsubishi Motors* and a number of other cases that

11  favor arbitration.  Claims are arbitrated all the time and

12  this, likewise, should be done.

13          MR. HERNANDEZ:  Judge, Mr. Seitz is conflating the

14  issue of enforceability, which we are not challenging the issue

15  of whether an intentional tort is arbitrable.

16          Those claims that are arbitrable we have put into

17  arbitration.  The traditional seaman's claims, albeit limited

18  because of Bahamian law.  The only claim here is the

19  intentional claim.

20          MR. SEITZ:  And Your Honor, just so I can preserve my

21  (inaudible) like Celebrity did.  We are not asking this Court

22  to make this determination of whether that claim is arbitrable

23  or not.  We posit that is for the arbitrator.

24          We are simply asking for this to be sent to the

25  arbitrator to determine which claims fall within the agreement

1  and are properly before the arbitrator.  That is cited in our

2  motions.

3        THE COURT:  Well, so here's what I conclude.

4        The issue of the stay of discovery and the

5  arbitrability of the agreement and all that as present is

6  before Judge Bloom.  So she has not referred it.  So ordinarily

7  I would stay out of it.

8        However, there is no pending stay.  So you are

9  entitled to discovery presumptively and so they had filed a

10  motion for protective order.

11        My interpretation in that situation is that I would

12  enforce the discovery, unless I found that there is basically a

13  substantial likelihood that the stay would be granted.  So they

14  are, in effect, asking for a stay.

15        And so I am in a position of saying, well, I don't

16  have to determine it, but is it likely that it would be

17  granted.  If it is likely that it would be granted, then by

18  granting the protective order, I am basically putting on the

19  table the dispute and that may ultimately resolve the dispute

20  sooner rather than later.

21        Because obviously if I were to grant the motion for

22  protective order, you can file an appeal with that to Judge

23  Bloom and say, see, this is what I am telling you.  We are not

24  getting discovery that we are entitled to.

25        So that is the standard under which I apply in this

1  type of dispute when I am secondary to a pending motion to stay

2  before the District Judge.  So I apply a substantially

3  likelihood status.

4       In favor of me, based upon the way that I am reading

5  these Eleventh Circuit cases, I think it would be groundless

6  not to rule in favor of the Plaintiff on the arbitrability of

7  these provisions.

8       I think I don't have a -- I can't figure out how I

9  would intellectually be able to distinguish between the type of

10 claims at issue in *Doe* and Malana versus your case.  So I rule

11 in favor of the Plaintiff.

12      So, but then you have this arbitration within an

13 arbitration agreement problem, which is the delegation

14 language.  And then, just taking a quick look at this, there's

15 a unanimous Supreme Court opinion from 2019 that says that

16 there is no frivolous or wholly groundless defense to a

17 delegation provision.

18      Meaning, that in this case some Courts have found that

19 even though the arbitrability of the underlying dispute would

20 normally be delegated, when it is wholly groundless, which I

21 think this is, that is an exception to the delegation doctrine.

22      And some Courts apparently call it frivolous.  If it

23 is frivolous somebody is arguing that something should be

24 arbitrated under a delegation doctrine and it is frivolous to

25 do so a Court should not have to compel arbitration to let an

1    arbitrator decide what the Court deems to be frivolous.

2         So I think it is a very good argument.  However,

3    apparently I lost my (inaudible) in this *Shine* case.  The case

4    is *Shine* v. Archer, 139 Supreme Court, 524.

5         And it basically said there is no exception even if

6    you think it is frivolous.  If there is an unmistakable

7    delegation agreement, then a Court is bound to enforce it no

8    matter how groundless you think it is.

9         So that is where the Supreme Court says in terms of

10   how broad delegation provisions are.  So, then, I look to the

11   agreement and the delegation provision seems pretty broad and

12   unlimiting.

13        So on the substantial likelihood analysis, even though

14   I think that the Plaintiff's position is entirely correct and I

15   think it is groundless to arbitrate this agreement under these

16   Eleventh Circuit cases, right?  One that I take your argument

17   what law applies here may matter.

18        So Bahamian law may require a different

19   interpretation.  So I take your point and maybe there is a -- I

20   doubt it, but maybe there is some settled Bahamian law that

21   would be different .

22        But, nonetheless, I think it is groundless to compel

23   arbitration given these Eleventh Circuit cases, but even as

24   groundless that I think all that is, under *Shine*, I don't know

25   how the Court can meet that finding and not stay the case at

1    least for the delegation determination.

2         So under a substantial likelihood analysis, I think

3    the Defendant, as groundless as it may be, the Defendant may

4    have a better argument.  So on that basis, I will grant the

5    motion for protective order.

6         File your appeal and then that way maybe Judge Bloom

7    will be able to get to it sooner rather than later.  And

8    obviously, the remedy for the Plaintiff is the extension of the

9    cutoff because obviously if she reverse my ruling, then, you

10   know, you are not going to be prejudiced.

11        So that's what I am going to conclude again.  I am not

12   deciding the stay because she may very well conclude that I am

13   wrong on this.  In which case, it moots my order and that's it.

14        So on the substantial likelihood ground based on *Shine*

15   and then I should say that the argument that the Plaintiff

16   makes on why they basically are in the same shoes as the

17   *Maglana* case I think is not persuasive.  I think they are

18   preserving their delegation argument.

19        So that's what I've got off the top of my head.  So I

20   will grant the motion for protective order on the substantial

21   likelihood basis.  I encourage you to file an appeal and then

22   the matter will all be before Judge Bloom and maybe she will

23   agree with me.

24        Now I guess my argument if I am right, I don't know

25   how she gets around it, but let's give her a chance, right?  If

1  I am right and the delegation they agree with that agreement

2  thing is an exception to your argument on the *Maglana* case,

3  maybe I am right, right?

4       Maybe there is no other way to look at it, but let's

5  we will tee it up, but I will grant your motion for protective

6  order on a substantial likelihood basis.

7       But I am clearly saying on the record that I think the

8  Plaintiff should prevail, but that's the state of the law, I

9  think I am bound to apply for now.

10      And obviously, the prejudice argument here to the

11  Plaintiff would be minimum because he would be entitled to

12  whatever discovery he is entitled to if the Court ultimately

13  reverses on this.

14      All right.  Although I note our cutoff is the 9th, but

15  obviously you would get relief.  Okay.  So we will tee it up

16  and see what happens.

17           MR. SEITZ:  Thank you, Judge.

18           MR. HERNANDEZ:  Thanks, Judge.

19           MR. HERNANDEZ:  I guess I am asking you for legal

20  advice.

21           THE COURT:  That's okay.  I will give it to you.

22           MR. HERNANDEZ:  You know, the Court, if Judge Bloom

23  were to deny the Defense's motion would I need to come back to

24  you to you to rescind today's ruling?

25           THE COURT:  No.  If I see an order denying the stay or

1   denying the motion to compel --

2          MR. HERNANDEZ:  Right.

3          THE COURT:  -- I will have an order vacating it.  In

4   effect, she probably will in her own order, but I will see it

5   and I will --

6          MR. SEITZ:  And if we do that we would ask for a

7   (inaudible) Mr. Hernandez, we would try to avoid getting Your

8   Honor involved in something like that.  I don't want to be back

9   here arguing about it.  I will work with Mr. Hernandez.

10         THE COURT:  Yes, I will look out for it, but file the

11  appeal.  File the appeal.

12         MR. SEITZ:  While we are sitting here, this is only

13  tangentially related.  I hope you find this at least more

14  interesting than our typical discovery hearings.  This was a

15  unique issue that we don't see very often.

16         THE COURT:  That is true.  It was more interesting and

17  intellectually stimulating.

18         MR. SEITZ:  Thank you, Judge.  Have a good afternoon.

19         MR. HERNANDEZ:  Nice to see you.

20         THE COURTROOM DEPUTY:  All rise.  Court is now

21  adjourned.

22             (Thereupon, the proceedings concluded.)

23

24

25

1

2                                    CERTIFICATE

3

4          I hereby certify that the foregoing transcript is an

5    accurate transcript of the audiotape recorded proceedings in

6    the above-entitled matter.

7

8

9

10
     03/13/24                          Bonnie Joy Lewis,
11                              Registered Professional Reporter
                                   CASE LAW REPORTING, INC.
12                                 7001 Southwest 13 Street,
                                 Pembroke Pines, Florida 33023
13                                      954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25